## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| Marvin Montgomery and Francisco Meza, as representatives of a class of similarly situated persons, and on behalf of the H-E-B Savings & Retirement Plan, | Case No. 5:19-cv-1063 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| H.E. Butt Grocery Company, the H-E-B Savings & Retirement Plan Investment & Administration Committee, and John and Jane Does 1-20, | |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs Francisco Meza and Marvin Montgomery ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the H-E-B Savings & Retirement Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants H.E. Butt Grocery Company ("H-E-B"), the H-E-B Savings & Retirement Plan Investment & Administration Committee ("Committee"), and John and Jane Does 1-20 (collectively, "Defendants").

2.      As described herein, Defendants have breached their fiduciary duties and engaged in other unlawful conduct to the detriment of Plaintiffs, the Plan, and the Class. Plaintiffs bring this action to recover all losses caused by Defendants' unlawful conduct, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

3.        As of the first quarter of 2019, Americans had approximately $8.2 trillion in assets invested in defined contribution plans, more than two-thirds of which was held in 401(k) plans. *See* Investment Company Institute, *Quarterly Retirement Market Data, First Quarter 2019* (June 19, 2019), available at https://www.ici.org/research/stats/retirement/ret_19_q1. Within the private sector, these defined contribution plans have largely replaced the defined benefits plans—or pension plans—that were predominant in previous generations.

4.        The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for funding the plan and is liable for any shortfalls if the plan cannot make those payments.  As a result, the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

5.        In a defined contribution plan, however, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no financial incentive to keep costs low or to closely monitor the plan to ensure that every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee.

6.        To protect workers from mismanagement of their hard-earned retirement assets, ERISA imposes strict duties of loyalty and prudence upon retirement plan fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to law." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000) (quotation omitted). Fiduciaries must act "solely in the interest

of the participants and beneficiaries," and exercise "care, skill, prudence, and diligence" in carrying out their fiduciary functions. 29 U.S.C. § 1104(a)(1).

7.     Contrary to these fiduciary duties, Defendants have failed to administer the Plan in the best interest of participants and have failed to employ a prudent process for managing the Plan. These fiduciary failures have manifested themselves in many different ways.

8.     First, Defendants failed to properly monitor and control the Plan's expenses, and allowed the Plan to become one of the most expensive "jumbo" 401(k) plans in the country. In 2016, among defined-contribution plans (like the Plan) with more than $1 billion in assets,[1] the average plan had participant-weighted costs equal to 0.25% of the plan's assets, and 90% of plans had annual costs under 0.48% per year. *See* BrightScope/Investment Company Institute, *A Close Look at 401(k) Plans, 2016*, at 47–48, available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf (hereinafter "2019 BrightScope/ICI Study"). However, ***the Plan's fees were, at a minimum, nearly three times the average***,[2] and at least 50% higher than the 90th percentile, making it ***one of the most expensive plans in the country*** with over $1 billion in assets. And these fees were not attributable to enhanced services for participants, but instead Defendants' use of high-cost investment products and managers, and their continued retention of those managers even after performance results demonstrated that those high fees were not justified (as discussed below).

9.     Second, Defendants failed to prudently monitor the expenses charged within the Plan's index funds (the U.S. Stock Index Fund, the U.S. Bond Index Fund, and the Global Stock

---

[1] As of the end of 2017, the Plan had approximately $2.5 billion in assets.
[2] Plaintiffs' estimates of the Plan's fees are based on the fee disclosure provided by Defendants to Plan participants. However, those disclosures explicitly state that certain categories of expenses were omitted from the disclosures. Indeed, it appears that Defendants failed to include the performance-based fees charged by hedge fund and private equity managers hired by the Plan. Had those fees been included, actual expenses would have been significantly higher. *See infra* ¶ 61.

Index Fund). These index funds charged fees that were up to ***seven times higher*** than comparable alternative index funds that tracked the exact same indexes with the same level of effectiveness. This further contributed to the Plan's high fees. Had Defendants prudently monitored the Plan's expenses and investigated marketplace alternatives, the Plan's participants would have paid several times less for comparable index funds.

10.     Third, Defendants also breached their fiduciary duties by utilizing an imprudent process to manage and monitor the Plan's target-risk funds, or "LifeStage funds," and by retaining those funds in the Plan.[3] Despite a marketplace replete with competitive target-risk fund offerings and experienced investment managers, Defendants utilized an internal team to design and manage the LifeStage funds, with no previous experience managing investments for defined-contribution plans. The team's inexperience resulted in fundamentally flawed asset allocations for the LifeStage funds. Additionally, the underlying investments used to populate the LifeStage funds were inappropriate given their high costs, speculative investment methodology, and ongoing poor performance. Had Defendants prudently considered other target-risk options in the market, they could have readily identified alternative target-risk funds from established fund managers with lower costs and a better performance track record. However, Defendants failed to conduct such an investigation. This further contributed to the Plan's high fees, and also contributed to the Plan's overall poor performance, which fell in the bottom 3% of peer plans overall.

11.     Fourth, Defendants failed to prudently consider alternatives to the Plan's money market fund, which offered only negligible returns that failed to keep pace with inflation. If Defendants had prudently considered other fixed investment alternatives, they would have

---

[3] The LifeStage funds consist of three funds designed to consider an investor's risk tolerance: the Aggressive Balanced, Conservative Balanced fund, and H-E-B General fund.  Defendants designated the H-E-B General fund as the Plan's default investment option.

discovered that stable value funds offer superior investment performance while still guaranteeing preservation of principal. For this reason, the vast majority of large retirement plans include stable value funds, and prudent fiduciaries overwhelmingly prefer stable value funds over money market funds. However, the Plan only included a money market fund, and did not offer a stable value fund as a capital preservation option, giving rise to an inference that Defendants failed to prudently monitor the Plan's fixed investment option and investigate marketplace alternatives. In this respect as well, Defendants failed to adopt a prudent decision-making process for managing the Plan's investment lineup.

12.     Fifth, Defendants authorized millions of dollars in direct payments from the Plan to H-E-B. This type of self-dealing is antithetical to the duty of loyalty, and is per se unlawful under ERISA's prohibited transaction provisions. *See* 29 U.S.C. § 1106. Moreover, the amount of these payments was entirely unreasonable and unjustified.[4]

13.     Finally, Defendants failed to properly investigate and negotiate a reasonable share of returns for the Plan's securities lending program.[5] It is customary for securities lending revenue to be split between a plan and the securities lending vendor, which in this case was State Street. Part of a fiduciary's duty after enrolling a plan in such a program is to monitor the fees being paid and monitor the marketplace, to ensure that the plan is maximizing available revenue and minimizing fees. With over $400 million in assets enrolled in the securities lending program, the Plan should have been able to negotiate an arrangement whereby the Plan was retaining 70 to 80

---

[4] Although Defendants have not properly disclosed the basis for these payments, it is likely that some of these payments were for in-house management of the Plan's target-risk funds.  As noted above, the expenses associated with those funds were unreasonable, and those funds should not have been retained in the Plan. *See supra* ¶ 10.

[5] Securities lending is a practice in which a fund lends out a portion of its portfolio securities to generate additional income from the interest paid by the borrower, reduced by an amount paid to a third-party securities lending agent who administers the program. *See* Securities and Exchange Commission, *Securities Lending by U.S. Open-End and Closed-End Investment Companies* (Feb. 27, 2014), available at https://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm. The Plan's four index funds were enrolled in a securities lending program.

percent of securities lending revenue. Indeed, State Street offered this rate to most of its other clients with similar amounts invested. Yet under the deal struck by Defendants, which has never been renegotiated, the Plan receives only 40 percent of securities lending revenue, resulting in higher fees and lower investment returns to the Plan. This rate is unreasonable under the circumstances, and further demonstrates Defendants' failure to engage in prudent fiduciary practices related to monitoring the Plan's service providers and minimizing the administrative expenses borne by the Plan.

14.     Based on this conduct and the other conduct alleged herein, Plaintiffs assert claims against Defendants for breach of their fiduciary duties of loyalty and prudence (Count One), engaging in prohibited transactions with a party-in-interest (Count Two), and engaging in prohibited transactions with a fiduciary (Count Three).  In addition, Plaintiffs assert a claim against H-E-B for failing to properly monitor the Committee and its members to ensure that they complied with ERISA (Count Four).

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of a plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

16.     This case presents a federal question under ERISA, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

17.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### Plaintiffs

18.     Plaintiff Francisco Meza ("Meza") resides in Houston, Texas. Meza has participated in the Plan since 2016, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3). As a Plan participant, Meza invested in each of the seven investment options in the Plan during the class period,[6] including the Aggressive Balanced fund, H-E-B General fund, Conservative Balanced fund, Global Stock index fund, U.S. Stock index fund, U.S. Bond index fund, and Money Market fund. Meza has been financially injured by Defendants' unlawful conduct, and his account would be worth more today if Defendants had not violated ERISA as described herein.

19.     Plaintiff Marvin Montgomery ("Montgomery") resides in Conroe, Texas, and participated in the Plan from approximately 2012 until 2018. During the class period, Montgomery's investments in Plan included one or more of the LifeStage Funds. Montgomery has been financially injured by Defendants' unlawful conduct, and is entitled to receive benefits in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein.

### The Plan

20.     The Plan was originally established effective January 1, 1976.

21.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

---

[6] The class period is limited to the period on or after September 3, 2013, *see infra* at ¶ 93, pursuant to ERISA's six-year statute of limitations, *see* 29 U.S.C. § 1113(1).

22.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

23.     According to the Plan's Form 5500s and other documents, the Plan is operated in San Antonio, Texas (Bexar County).

24.     The Plan covers eligible employees of H-E-B and its various affiliates and/or subsidiaries. Participants' accounts are funded through their own contributions. In addition, participants also received contributions from H-E-B.

25.      The Plan has had at least $1.9 billion in assets throughout the class period. As of the end of 2013, the Plan had approximately $2.0 billion in assets. As of the end of 2017, the Plan had approximately $2.5 billion in assets.

26.     Plan participants may allocate the monies in their accounts among seven investment options. These investments include the Aggressive Balanced fund, H-E-B General fund, Conservative Balanced fund, U.S. Stock index fund, Global Stock index fund, U.S. Bond index fund, and Money Market fund.

### Defendants

*H-E-B*

27.     Defendant H-E-B is headquartered in San Antonio, Texas. H-E-B is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B), and has ultimate decision-making authority with respect to the management and administration of the Plan and the Plan's investments. Because H-E-B exercises discretionary authority or discretionary control with respect to management of the Plan, as well as discretionary authority and responsibility with respect to the administration of the Plan, it is a fiduciary under 29 U.S.C. § 1002(21)(A).

28.     H-E-B is also a fiduciary because it possessed authority to appoint and remove members of the Committee, to whom it delegated certain fiduciary functions. In addition, H-E-B appointed the internal management team that managed the LifeStage funds. It is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *See In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 552 (S.D. Tex. 2003) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996)) ("the power … to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)"). Further, the responsibility for appointing and removing members of the Committee carried with it an accompanying duty to monitor the appointed fiduciaries to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17).

### *The H-E-B Savings & Retirement Plan Investment & Administration Committee*

29.     The Committee is designated as a Plan fiduciary in Section X of the Plan Document. Thus, the Committee and its members are named fiduciaries under 29 U.S.C. § 1102(a).

30.     The Committee is also designated in Section X of the Plan Document as the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A). This renders the Committee and its members fiduciaries by virtue of their position in regard to the administration of the Plan. *See* 29 C.F.R. § 2509.75-8 at D-3.

31.     In addition to administering the Plan generally, the Committee and its members have responsibility for how Plan assets are invested and administered, including appointing investment managers and periodically reviewing and monitoring the Plan's investments. Thus, the

Committee and its members are also functional fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting the management of the Plan and the management of disposition of Plan assets.

32.     The names of the members of the Committee during the class period are currently unknown to Plaintiffs.  Those individual Defendants are therefore collectively named as John and Jane Does 1–20.

### ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

33.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>      (i)     Providing benefits to participants and their beneficiaries; and
>      (ii)    Defraying reasonable expenses of administering the plan; [and]
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

#### DUTY OF LOYALTY

34.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of

its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

**DUTY OF PRUDENCE**

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014) (quotation omitted). This duty includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct at 1828.  If an investment is not appropriate for the plan, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

**SOURCE AND CONSTRUCTION OF DUTIES**

36.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

37.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) ("'[C]ost-conscious management is fundamental to prudence in the investment function' and should be applied 'not only in making investments but also in monitoring

and reviewing investments.'") (quoting Restatement § 90 cmt. b) ("*Tibble II*"). The Introductory

Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent
> investor rule. This is done to reflect the importance of market efficiency concepts
> and differences in the degrees of efficiency and inefficiency in various markets. In
> addition, this emphasis reflects the availability and continuing emergence of
> modern investment products, not only with significantly varied characteristics but
> also with similar products being offered with significantly differing costs. The duty
> to be cost conscious requires attention to such matters as the cumulation of fiduciary
> commissions with agent fees or the purchase and management charges associated
> with mutual funds and other pooled investment vehicles. In addition, active
> management strategies involve investigation expenses and other transaction costs
> ... that must be considered, realistically, in relation to the likelihood of increased
> return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries

are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider

higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies ...

entail investigation and analysis expenses and tend to increase general transaction costs .... [T]hese

added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).[7]

Courts have emphasized the importance of fiduciary cost control in the management of defined

contribution plans. *See Tibble II*, 843 F.3d. at 1198 ("[A] trustee cannot ignore the power the trust

wields to obtain … lower cost[s][''']).

---

[7] The emphasis in trust law and under ERISA in minimizing expenses is consistent with academic and financial
industry literature, which has consistently shown that the most important consideration in selecting prudent
investments is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior
investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on
a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for
Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*,
at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is
the fund's expense ratio").  According to this published academic literature:

> [T]he empirical evidence implies that superior management is not priced through higher expense
> ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even
> after controlling for funds' observable characteristics) is more than one-to-one, which would imply
> that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the
> market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

38.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation and citation marks omitted). Mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

### PROHIBITED TRANSACTIONS

39.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

> * * *
> (C)     furnishing of goods, services, or facilities between the plan and party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) further provides, in pertinent part, that:

> [A] fiduciary with respect to the plan shall not –

> (1)     deal with the assets of the plan in his own interest or for his own account,
> (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or
> (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### CO-FIDUCIARY LIABILITY

40.    ERISA also imposes co-fiduciary responsibility on plan fiduciaries. *See* 29 U.S.C.

§ 1105(a).  The statute expressly provides that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>>
>> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

### PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

41.    Fiduciaries are obligated to assemble a diversified menu of investment options. 29

U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Each investment option is generally a

pooled investment product—which includes mutual funds, collective investment trusts, and

separate accounts—offering exposure to a particular asset class or sub-asset class. 2019

BrightScope/ICI Study at 2; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive*

*Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485

(2015). The broad asset classes generally include fixed investments, bonds, stocks, and

occasionally real estate. Money market funds, guaranteed investment contracts, and stable value

funds are examples of fixed investments. Bonds are debt securities, which are generally

categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities,

corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and

the credit risk associated with the particular borrower. Equity, or stock, investments, are generally

defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks). Balanced funds are a type of fund that invests in a mix of stocks, bonds, and occasionally other assets. Target-risk funds, such as the LifeStage funds, are balanced funds that assemble a portfolio of investments to match the risk preference of the investor. Each target-risk portfolio is typically made up of other pooled investment funds.

42.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

## MINIMIZATION OF PLAN EXPENSES

43.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

44.     Poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. The United States Department of Labor has cautioned that a one percent difference in fees and expenses can reduce the investor's account balance at retirement by **28 percent**. *See* U.S. Department of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (2013), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. The U.S. Securities and Exchange Commission and others similarly warn that although the fees and costs associated with investment products and services may seem small, over time they can have a major impact on an investor's portfolio. *See* SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), available at https://sec.gov/investor/alerts/ib_fees_expenses.pdf.

45.     A major category of expenses within a defined contribution plan are investment management expenses.  Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf   (hereinafter   "ICI/Deloitte   Study"). Investment management expenses are the fees that are charged by investment managers for managing particular investments, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*

46.     Fiduciaries exercising control over a plan's investment options can minimize plan expenses by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale allow larger plans to lower investment management fees by selecting funds only available to institutional investors, or by negotiating directly with the investment manager to obtain even lower rates.[8] Empirical evidence bears this out. In 2016, total participant-weighted plan fees in the average defined contribution plan were 0.62%, but this varied between an average of 1.29% in plans with $1 million to $10 million in assets, and an average of only 0.25% for plans with over $1 billion in assets. 2019 BrightScope/ICI Study at 47.

47.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of investment expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy,

---

[8] *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

*Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## DEFENDANTS' VIOLATIONS OF ERISA

### I.   DEFENDANTS FAILED TO MONITOR AND CONTROL THE EXPENSES PAID BY THE PLAN

48.     One consistent feature of the Plan has been high costs relative to peer plans. For example, in 2015 total Plan costs were at least $14,100,000, or 0.72% of the approximately $1.96 billion in Plan assets. In 2016, total Plan costs were at least $15,400,000, or 0.71% of the approximately $2.17 billion in Plan assets.

49.     These costs are extraordinarily high for a defined-contribution plan with over $1 billion in assets. In 2015, the average participant-weighted total plan cost for plans with over $1 billion in assets was 0.28%, while ninety percent of such plans had total expenses of 0.51% or less. BrightScope/Investment Company Institute, *A Close Look at 401(k) Plans, 2015*, at 53–54, available at https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf (hereinafter "2018 BrightScope/ICI Study"). In 2016, the average participant-weighted total plan cost for plans with over $1 billion in assets fell to 0.25%, while the 90th percentile of total plan costs among such plans also fell to 0.48%. 2019 BrightScope/ICI Study at 47–48. Thus, the Plan was one of the most expensive plans in the country with over $1 billion in assets.

50.     Based on the Plan's expenses relative to other similarly-sized plans, it is reasonable to infer that Defendants lacked a prudent process for monitoring and controlling Plan expenses.  A prudent fiduciary would have more closely scrutinized the expenses incurred by the Plan, and would not have allowed the Plan to incur such a large amount of expenses.

51.     As a result of Defendants' failure to rein in Plan costs, Plan participants have suffered significant losses. Had the Plan limited its expenses to the average total cost for similarly-

sized plans, Plan participants would have saved at least $10 million in fees in 2016 alone, and would have achieved millions of dollars in savings in other years as well.

## II.   DEFENDANTS FAILED TO PROPERLY MONITOR THE PLAN'S INDEX FUNDS, AND IMPRUDENTLY RETAINED THOSE FUNDS IN SPITE OF SUPERIOR ALTERNATIVES

52.     One example of Defendants' cost-control failures is the excessive expenses that were levied on participants for the Plan's three passively-managed index fund offerings. Because index funds are passive investment options which attempt to mimic the performance of a market index rather than make subjective determinations about the merits of particular stocks or bonds, the most important factor for a prudent investor to consider in selecting an index fund is fees. *See* Gail Marks-Jarvis, *Step-by-Step Guidance on Shopping for Index Funds*, Chicago Tribune (Aug. 16, 2015), available at http://www.chicagotribune.com/business/yourmoney/ct-marksjarvis-0816-biz-20150814-column.html.

53.     Prudent management of a plan's index fund investment therefore requires a fiduciary to closely monitor the fees of the plan's index funds, considering the available alternatives as well as the fees being paid by similarly-sized plans, and then using the plan's leverage to negotiate the lowest possible rates.

54.     The Plan offered participants a U.S. Stock index fund, Global Stock index fund, and U.S. Bond index fund managed by State Street that charged annual expenses of 0.11%, 0.13%, and 0.14% respectively as late as 2018. These funds were collective investment trusts in which the investment management fees were expressly made negotiable.

55.     Given both the size of the Plan and the amount invested in each index fund option, a plethora of significantly lower-cost options were available in the marketplace. As shown by the charts below, the fees for the index funds in the Plan are considerably more expensive – indeed, up to *7 times more expensive* – than alternatives possessing the same investment objective:

| Plan Fund | Expense Ratio | % Plan Fund Fee Excess |
|---|---|---|
| U.S. Stock Index Fund | 0.11% | |
| *Lower Cost Alternative* | | |
| Fidelity 500 Index (FXAIX) | 0.015% | 633% |
| Vanguard Institutional Index I Plus (VIIIX) | 0.02% | 450% |

| Plan Fund | Expense Ratio | % Plan Fund Fee Excess |
|---|---|---|
| U.S. Bond Index Fund | 0.14% | |
| *Lower Cost Alternative* | | |
| Fidelity US Bond Index (FXNAX) | 0.025% | 460% |
| Vanguard Total Bond Market Index I (VBTIX) | 0.035% | 300% |

| Plan Fund | Expense Ratio | % Plan Fund Fee Excess |
|---|---|---|
| Global Stock Index Fund | 0.13% | |
| *Lower Cost Alternative* | | |
| Vanguard Total World Stock Index I (VTWIX) | 0.08% | 62.5% |
| 60/40 Vanguard US / MSCI EAFE Index Funds[9] | 0.033% | 290% |

56.     In addition to these lower-cost mutual fund alternatives, with over $500 million in Plan assets in these three index funds, Defendants should have been able to negotiate fees with State Street as low as 0.013% on the Stock Index Fund, 0.025% on the Bond Index Fund, and 0.04% on the Global Stock Index Fund.

57.     A prudent fiduciary acting in the best interest of participants would not have selected and retained index fund options with fees that significantly exceeded market rates and the rates that State Street itself offered in the marketplace. Defendants' failure to procure lower-cost index fund options or negotiate competitive index fund fees with State Street demonstrates that Defendants failed to properly monitor the Plan's investment expenses, and that Defendants'

---

[9] The Plan did not use an actual global index fund. The Plan's "Global Index Fund" was simply a 60/40 mix of an S&P 500 index fund and an international index fund tracking the MSCI EAFE index. Using Vanguard's index funds that track those two indexes in a 60/40 ratio would have resulted in a blended expense ratio of .033% per year.

fiduciary processes "have been tainted by failure of effort, competence, or loyalty," supporting "a claim for breach of fiduciary duty." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009); *see also Moreno v. Deutsche Bank Americas Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (offering "index funds … [that] charged fees that were excessive compared with similar investment products" supported breach of fiduciary duty claim).

## III. DEFENDANTS FAILED TO PROPERLY MONITOR THE PLAN'S "LIFESTAGE" FUNDS, AND IMPRUDENTLY RETAINED THOSE FUNDS IN SPITE OF SUPERIOR ALTERNATIVES

58.     Defendants also failed to prudently monitor and evaluate the Plan's LifeStage funds. Those funds were significantly more expensive than marketplace alternatives, and their returns did not justify the added cost.  Indeed, they were among the worst-performing funds of their kind. Given the inferiority of these funds, a prudent fiduciary would not have maintained them in the Plan.

### A.   THE LIFESTAGE FUNDS WERE EXCESSIVELY COSTLY

59.     In 2015, in plans with over $1 billion in assets, the average expense ratio for non-target date balanced mutual funds, such as the LifeStage funds, was 0.32%. 2018 BrightScope/ICI Study at 57. In 2016, the average expense ratio for non-target date balanced mutual funds in plans with over $1 billion in assets fell to 0.31%. 2019 BrightScope/ICI Study ICI Study at 51.  Although more recent data is not yet available, it is reasonable to assume that expenses for these funds have not gone up, and likely have fallen further since then, given the long-term trend toward lower fees. *See id.,* at 55–56.

60.     The expenses for the LifeStage funds in the Plan were significantly higher than average. In 2018, the three LifeStage funds in the Plan had reported expense ratios between 0.52% and 0.88% (with an asset-weighted average of approximately 0.80%), all materially higher than the category averages of 0.32% and 0.31%.

61. Furthermore, it appears that the actual cost of investing in the LifeStage funds exceeds what was disclosed to participants. Indeed, Plan fee disclosures explicitly state that fund expense ratios may *not* include all fees deducted from participants' investment returns. And in fact, twenty to thirty percent of the LifeStage funds' assets (about $600 million of Plan assets as of the end of 2017) are invested in high-cost, illiquid, and speculative asset classes such as private equity and hedge funds. These funds often employ what is known as the "two and 20" fee model. This fee arrangement charges 2% of assets under management annually for investment management services while imposing an additional performance or incentive fee of 20% of profits earned by the fund over a predefined benchmark. In addition, miscellaneous fees outside of the two and 20 arrangement, such as "monitoring" fees and "custody" fees, are also thrust upon investors. Given the high costs associated with hedge fund and private equity investments, the LifeStage Funds' high allocation to such vehicles, and H-E-B's explicit statement that its expense disclosures were incomplete, it is apparent that the expenses associated with the LifeStage Funds were higher than what wass disclosed to participants. Including the total costs of hedge fund and private equity fund investments, the actual expenses of the LifeStage funds were at least 25% - 75% higher than what was disclosed by H-E-B.

**B. THE PERFORMANCE OF THE LIFESTAGE FUNDS DID NOT JUSTIFY THEIR COST AND REFLECTS IMPRUDENT FUND DESIGN**

62. The fees charged by the LifeStage funds were not justified by their performance. As shown by the tables below, each LifeStage fund failed to keep pace with an appropriate Dow Jones benchmark index comparator over the last five- and ten-year periods, and also generally lagged their stated Lipper peer groups:

| Fund | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|------|--------------------------|---------------------------|
| Conservative Balanced Fund | 3.17% | 3.99% |
| *Lipper: Conserv. Target Allocation* | *2.52%* | *6.05%* |
| *Dow Jones US Mod. Conserv. Benchmark* | *4.38%* | *7.66%* |

| Fund | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|------|--------------------------|---------------------------|
| H-E-B General Fund | 2.57% | 5.95% |
| *Lipper: Moderate Target Allocation* | *3.18%* | *7.51%* |
| *Dow Jones US Moderate Benchmark* | *5.28%* | *9.71%* |

| Fund | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|------|--------------------------|---------------------------|
| Aggressive Balanced Fund | 2.02% | 6.33% |
| *Lipper: Growth Target Allocation* | *3.91%* | *8.75%* |
| *Dow Jones US Mod. Agg. Benchmark* | *6.02%* | *11.62%* |

63.     The LifeStage funds fared even worse when compared to specific market alternatives. Throughout the statutory period, there were a plethora of less expensive, better performing target-risk funds that would have better served participants.  The tables below provide some examples:[10]

| Fund | Expense Ratio | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|------|---------------|--------------------------|---------------------------|
| Conservative Balanced Fund | 0.52% | 3.17% | 3.99% |
| *Market Alternatives* | | | |
| BlackRock 20/80 Target Allocation I (BICPX) | 0.47% | 3.33% | 7.65% |
| BlackRock Managed Income K (BLDRX) | 0.44% | 4.04% | 6.07% |
| Wells Fargo Diversified Income Builder I (EKSYX) | 0.52% | 4.83% | 9.72% |
| Vanguard LifeStrategy Income (VASIX) | 0.11% | 3.44% | 5.18% |
| Vanguard LifeStrategy Conservative Growth Inv (VSCGX) | 0.12% | 4.02% | 6.74% |

| Fund | Expense Ratio | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|------|---------------|--------------------------|---------------------------|
| H-E-B General Fund | 0.83% | 2.57% | 5.95% |
| *Market Alternatives* | | | |
| Vanguard Wellington Admiral (VWENX) | 0.17% | 6.29% | 9.96% |
| Dodge & Cox Balanced (DODBX) | 0.53% | 5.77% | 11.04% |
| T. Rowe Price Capital Appreciation (PRWCX) | 0.71% | 8.25% | 12.58% |
| American Funds American Balanced R6 (RLBGX) | 0.28% | 6.52% | 10.64% |
| Fidelity Balanced K (FBAKX) | 0.45% | 5.91% | 10.45% |
| Vanguard LifeStrategy Moderate Growth Inv (VSMGX) | 0.13% | 4.53% | 8.17% |

---

[10] The expense ratios for the LifeStage funds in the following charts are the stated expense ratios.  The actual expense ratios for the LifeStage funds are likely higher due to H-E-B's omission of certain fees (see *supra* ¶ 61).

| Fund | Expense Ratio | 5-Year Return (12/31/18) | 10-Year Return (12/31/18) |
|---|---|---|---|
| Aggressive Balanced Fund | 0.88% | 2.02% | 6.33% |
| *Market Alternatives* | | | |
| American Funds Income Fund of America R6 (RIDGX) | 0.28% | 5.20% | 9.78% |
| Fidelity Strategic Dividend & Income (FSDIX) | 0.72% | 6.22% | 11.87% |
| Vanguard LifeStrategy Growth Inv (VASGX) | 0.14% | 4.95% | 9.51% |

64. Plaintiffs do not allege that the LifeStage funds' low returns, by themselves, constitute a fiduciary breach. However, these poor returns demonstrate that the high fees charged by the underlying managers within the LifeStage funds were not justified by realistically evaluated return expectations. *See supra* ¶ 37, n.7.

65. Further, the LifeStage funds' poor performance is the product of their imprudent design. As noted above, the LifeStage funds were heavily invested in private equity and hedge funds, see *supra* ¶ 61, and included a byzantine array of **eighty** component institutional investment strategies, many of which were entirely inappropriate for inclusion in a 401(k) plan.

66. For example, during the class period the LifeStage Funds in the Plan had a $20 million to $30 million stake in the Kohinoor Core hedge fund. Pitched as a fund designed to "substantially outperform in periods of extreme market movement and volatility," its presence in a retirement plan portfolio is indefensible. The fund operates by purchasing "option contracts" that pay out only if the market falls. If a market drop of sufficient magnitude fails to happen in the manner or timeframe predicted by the fund's managers, these contracts expire without value and can leave the fund entirely worthless. Speculative funds such as the Kohinoor Core fund are dubbed "black swan" funds because of their bets on extreme and unlikely catastrophes and potential to lose all of their value if the bets are misplaced. These significant losses are not purely hypothetical. Since inception, the Kohinoor Core fund has taken a partial loss (-99% to 0%) on 27% of its trades, and has taken a **total loss** (-100%) on **31%** of all trades. These futile trades have

resulted in significant negative returns for the fund, even compared to the already volatile hedge fund universe, in five of the last six years:

| Fund / Index | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| Kohinoor Core Fund | -10.39% | 4.77% | -14.54% | -18.61% | -24.66% | -4.68% |
| *Barclay Hedge Fund Index* | 11.12% | 2.88% | 0.04% | 6.10% | 10.36% | -5.23% |
| *Eurekahedge Hedge Fund Index* | 9.10% | 5.15% | 2.31% | 4.83% | 8.54% | -3.99% |
| *HFRX Global Hedge Fund Index* | 6.72% | -0.58% | -3.64% | 2.50% | 5.99% | -6.72% |

67.     It is important to note that despite appearances, funds such as the Kohinoor Core Fund are *not* conservative in nature, nor do they serve as a hedge against market downturns. There are no underlying assets with inherent value designed to appreciate over time, but instead a series of literal bets that various calamities will unfold. Indeed, the Kohinoor Core Fund lost money in the fourth quarter of 2018, despite the market downturn. If the fund were an actual hedge against market downturns, this would not have been the case.

68.     Another example of an imprudent investment strategy within the LifeStage funds was the AlphaSector strategy managed by F-Squared Investments, Inc. ("F-Squared"). AlphaSector was a speculative sector rotation, market timing strategy that relied upon an algorithm developed by a college student to signal whether to sell or purchase exchange-traded funds within various industries that comprise the S&P 500 index. F-Squared claimed to have vastly outperformed the S&P 500 index dating back to 2001 and to have proceeded unscathed through the economic crisis of 2008-09. In reality, the performance numbers that F-Squared claimed its AlphaSector strategy was generating were entirely hypothetical. F-Squared relied upon the application of its algorithm to historical market data to generate performance history and used this completely theoretical (i.e. fake) "performance history" to attract investors. To make matters worse, a mistake was made in the process of calculating the hypothetical return numbers that

further inflated the already overstated investment performance shown in the strategy's marketing materials. *See* Reuters, *Former F-Squared CEO Must Pay $12.4 Million in SEC Case*, (Mar. 20, 2018) available at https://www.reuters.com/article/us-fsquared-lawsuit/former-f-squared-ceo-must-pay-12-4-million-in-sec-case-u-s-judge-idUSKBN1GW2CK.

69.     These issues led the Securities and Exchange Commission to launch an investigation into the firm and its AlphaSector strategy. In October 2013, F-Squared chief executive Howard Present sent a letter to clients, including H-E-B, notifying them of the investigation into the firm's "use of historic data in advertising material." The SEC's investigation culminated in a $35 million settlement and admission of wrongdoing by F-Squared in 2014, and a $12.4 million judgment against Present for his role in misleading investors. Despite clear red flags, H-E-B failed to perform its own due diligence and continued to employ F-Squared through Present's client letter and the SEC settlement. The Committee did not cut ties with F-Squared until 2015.

70.     There were other warning flags as well.  As early as 2012, it was reported that the type of overly-complicated, hedge-fund heavy investment design employed by the LifeStage funds was disastrous for institutional investors. *See* Forbes, *The Curse of the Yale Model*, (Apr. 16, 2012) available at https://www.forbes.com/sites/rickferri/2012/04/16/the-curse-of-the-yale-model/#609a69883dae. Yet, Defendants retained the LifeStage funds in the Plan and did not reconsider whether their design was appropriate for the Plan.  To the contrary, one of the LifeStage funds (the General fund) was retained as the Plan's **default** investment option. *See supra* ¶ 10 at n.3.  A prudent fiduciary acting in the best interest of participants would not have retained the LifeStage funds in the Plan, and certainly would not have made them the Plan's default investment option.

71.     The excessive fees and consistent underperformance of the LifeStage funds (which comprised over 80 percent of Plan assets during the class period) have significantly dragged down the Plan's overall returns, leading it to be one of the worst performing 401(k) plans in the nation. Over the three most recently reported five-year periods ending in 2015, 2016, and 2017, the Plan lagged the median return of peer 401(k) plans by a minimum of 1.7% per year, placing it in the bottom ten percent of all peer plans over all three periods.[11] And in the most recent five-year period with comparative data available covering the period from 2013 to 2017, the Plan returned just 6.21% per year compared to the median plan's 9.49% annual return, placing it in the **bottom 3%** of all peer plans.

## IV.     DEFENDANTS FAILED TO CONSIDER SUPERIOR CAPITAL PRESERVATION OPTIONS FOR THE PLAN

72.     The Plan's lone remaining investment option (other than the LifeStage and index funds), the H-E-B Money Market fund, also was not prudently monitored and retained by Defendants.

73.     Throughout the statutory period, at least $50 million of Plan assets were invested in the H-E-B Money Market fund. Advertised to participants as an option that would achieve returns that closely parallel the rate of inflation over the long-term, the fund has failed to do so. Over the five- and ten-year periods ending December 31, 2018, the fund achieved returns of 0.52% and 0.34%, respectively. Over these same five and ten-year periods, the Consumer Price Index, one of the most frequently used statistics for assessing inflation rates, averaged 1.52% and 1.80%, respectively. As a result, this so-called capital preservation fund lost money, net of inflation.

---

[11] This sample includes defined contribution plans with at least $1 billion in assets as of the end of 2011, complete Form 5500 filings for each year 2011-2017, a 1/1 – 12/31 plan accounting year, and no investment in employer stock. The 2017 data is the most recent data available.

74.     There were far better capital preservation options at comparable levels of risk that were available in the marketplace and would have generated greater returns for participants. Experts have stated for years that principal preservation options within defined contribution plans should include investment vehicles like stable value funds. Like money market funds, stable value funds invest in an underlying portfolio of investment-grade fixed income securities whose principal is guaranteed by the issuer. But stable value funds can generate additional yield by using longer-maturity securities, while avoiding the associated risk of principal loss by purchasing insurance contracts from highly-rated insurance companies guaranteeing the portfolio against loss of principal. Stable value funds thus provide preservation of principal comparable to money market funds while consistently generating greater returns for investors.

75.     Given the superior yields offered by stable value funds at comparable levels of risk, large plans like the Plan overwhelmingly favor stable value funds as capital preservation vehicles. *See* Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30. "With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)." *Id.*[12]  Indeed, a 2011 study from Wharton Business School, analyzing money market and stable value fund returns from the previous two decades, went so far as to conclude that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), *available at* http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf; *see* also Paul

---

[12] As the Department of Labor has stated, "because every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk ...." 29 C.F.R. § 2509.2015-01.

J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plan and the Choice Between Stable Value and Money Market*, 39 Akron L. Rev. 9, 20–27 (2006).

76.     The returns that could have been achieved by transferring the Plan's money market investment to a competitive stable value option are illustrated by data from Hueler Analytics. The Hueler Index is the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com. Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. As shown below, the returns of the funds in the Hueler universe on average have far exceeded the rate of inflation and the returns of the money market fund that Defendants offered within the Plan:

| Returns | Hueler Index | Consumer Price Index Average Percent Change (Inflation) | H-E-B Money Market Fund |
|---|---|---|---|
| **5-Year Period Ending 12/31/18** | 1.89% | 1.46% | 0.52% |
| **10-Year Period Ending 12/31/18** | 2.24% | 1.53% | 0.34% |

77.     A prudent fiduciary would have considered higher yielding alternatives (such as a stable value fund) to the H-E-B Money Market fund in which the Plan was invested.  The fact that Defendants failed to do so further evidences an imprudent investment process that failed to serve the best interest of participants.

## V.     DEFENDANTS IMPROPERLY DIRECTED PAYMENTS FROM THE PLAN TO H-E-B

78.     Further contributing to the Plan's excessive overall costs, see *supra* ¶¶ 48–51, Defendants directed handsome payments to H-E-B on an annual basis for unspecified services. For example, the Plan paid $750,352 to H-E-B in 2014, and an additional $694,954 to H-E-B in

2015 for its role as the Plan Administrator. These payments continued in other years as well, with total payments to H-E-B from the Plan amounting to at least $2 million during the class period.

79.     This type of self-dealing is per se prohibited by ERISA's prohibited transaction provisions.  *See* 29 U.S.C. §§ 1106(a), 1106(b). At all relevant times, H-E-B was both a fiduciary of the Plan and a party-in-interest as defined by ERISA.

80.     It is unclear what these payments were for, as H-E-B failed to provide an explanation of services performed in the appropriate section of the Plan's annual Notes to Financial Statements. However, it appears that a significant portion of the payments were associated with compensation paid to in-house investment personnel for their role in managing the Plan's investments.

81.     The LifeStage funds were created shortly after H-E-B hired its own Director of Investments and Investment Officer/Research Analyst for the Plan. Neither of the two persons who were hired had any defined contribution management experience prior to joining H-E-B. Together, they maintained the LifeStage funds.

82.     The compensation paid by the Plan for these in-house investment personnel was unnecessary, unreasonable, and unjustified in light of (1) their inexperience managing defined contribution plan assets; (2) the ready availability of alternative target-risk funds that required no in-house investment expertise to manage (see *supra* ¶ 63) and (3) the already excessive fees paid to the Plan's outside investment advisors and managers. Further, the inferiority of the Plan's LifeStage funds and other investments demonstrates that the Plan's in-house investment personnel (and outside investment advisors) provided no value for the compensation they received, and actually did more harm than good.

83.     A prudent fiduciary acting in the best interests of the Plan would not have arranged for the Plan to make over $2 million in payments to the Plan sponsor (H-E-B) during the class period, and would not have retained inexperienced in-house investment personnel to manage Plan investments.  These measures were wrongly intended to benefit H-E-B, not the Plan's participants.

## VI.     DEFENDANTS FAILED TO PRUDENTLY EVALUATE THE PLAN'S SECURITIES LENDING ARRANGEMENT AND FAILED TO INVESTIGATE THE AVAILABILITY OF MORE FAVORABLE REVENUE SPLITS

84.     In addition to the foregoing fiduciary failures, Defendants also failed to prudently evaluate the Plan's securities lending arrangement with State Street Bank & Trust Company ("State Street").

85.     Securities lending refers to the transfer of a security by one party to another in exchange for cash collateral that can in turn be reinvested to generate income for the lender. *See* Vanguard, *Securities Lending: Still No Free Lunch* (July 2011) at 1, available at https://personal.vanguard.com/pdf/icrsl.pdf. The net earnings from this reinvestment income are then split between the lender and the lending agent. *Id.* at 6. This fee split can have a significant impact on expenses paid by the investors.

86.     A prudent fiduciary who has enrolled a retirement plan in a securities lending program will monitor the fees being paid to the securities lending agent and monitor general trends in the marketplace, to ensure that the plan is maximizing its securities lending revenue, properly managing its risk exposure, and minimizing the fees being paid to third parties. In fact, State Street itself suggests that the first question to be asked when evaluating a securities lending agreement is "What is the fee split with the lending agent?" State Street Global Advisors, *Securities Lending in US DC Funds* (2018) at 2, available at https://www.ssga.com/investment-topics/defined-contribution/2019/Securities-Lending%20-US-Defined-Contribution-Funds.pdf.

87.     In general, State Street applies a 70-30 fee split on the gross lending revenue of the funds within its defined-contribution lending program. State Street Global Advisors, *Securities Lending in US DC Funds: What to Look For* (2019) at 8, available at https://www.ssga.com/investment-topics/defined-contribution/2019/Securities-Lending-US-Defined-Contribution-Funds-whitepaper.pdf. This means that 70% of the gross revenue generated from the reinvestment is returned to the retirement plan with no additional fees.

88.     Although the 70-30 split is promoted by State Street as the general arrangement, information available from the SEC reveals that State Street has arrangements that provide for 75-25, 80-20, 85-15, and even 90-10 revenue splits.

89.     With over $400 million in Plan assets enrolled in State Street's securities lending program, Defendants should have been able to negotiate an arrangement whereby the Plan was retaining 70 to 80 percent of securities lending revenue, similar to what other State Street retirement plan clients were paying for the exact same services being provided to the Plan. Yet under the deal struck by Defendants, which has never been renegotiated, the Plan receives only 40 percent of securities lending revenue, with the remainder going to State Street, resulting in higher administrative fees paid to State Street and lower investment returns for the Plan.

90.     Had Defendants prudently evaluated the fee split arrangement between State Street and the Plan, and monitored that arrangement in light of alternative arrangements being offered to other plans in the marketplace, they would have negotiated more favorable fee splits, which would have been more favorable for the Plan and its participants.  Instead, Defendants blindly accepted and failed to re-negotiate a 40-60 fee split with State Street that was even less favorable than the norm. This was imprudent and inconsistent with the best interest of participants.  A prudent and loyal fiduciary would not have accepted such an arrangement and allowed it to persist undisturbed.

## LACK OF KNOWLEDGE OF DEFENDANTS' INVESTMENT PROCESS AND OTHER MATERIAL FACTS

91.     Plaintiffs did not have actual knowledge of all material facts (including, among other things, the Plan's overall costs compared to those of other similarly-sized plans, the amount spent by the Plan for investment advisory services in comparison to other plans, the costs of the Plan's investments vis-à-vis comparable investments in similarly-sized plans, the overall performance of the Plan compared to other similarly-sized plans, the performance of the Plan's investments vis-à-vis comparable investments in similarly-sized plans, the inferiority of money market funds to stable value funds, the widespread usage of stable value funds among other large retirement plans, the nature of the payments from the Plan to H-E-B, the qualifications and experience of the Plan's in-house investment personnel and outside investment advisors, the specifics of the Plan's securities lending arrangement with State Street, and State Street's securities lending arrangements with other plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.[13] Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan or the Plan's investments because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

92.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a).

---

[13] Plaintiffs' counsel began an investigation of the Plan in late 2018. Plaintiffs did not review any of the documents cited in this Complaint or any of the information contained therein—including all studies, investment data, and Form 5500s cited herein—until after this investigation had begun.

Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

93.     Plaintiffs assert their claims in Counts I - IV on behalf of the following class:[14]

> All participants and beneficiaries of the H-E-B Savings & Retirement Plan at any time on or after September 3, 2013, excluding Defendants, any other employees with responsibility for the Plan's investment or administrative functions, and members of H-E-B's Board of Directors.

94.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between approximately 33,000 and 45,000 participants during the applicable statutory period.

95.     Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

96.     Adequacy:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

---

[14] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

97.    Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Defendants are fiduciaries of the Plan;

    b.  Whether Defendants breached their duty of loyalty by engaging in the conduct described herein;

    c.  Whether Defendants breached their duty of prudence by engaging in the conduct described herein;

    d.  Whether Defendants caused the Plan to engage in transactions prohibited by ERISA;

    e.  Whether Defendants breached their duty to monitor other Plan fiduciaries;

    f.  The proper measure of monetary relief; and

    g.  The proper form of equitable and injunctive relief.

98.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

99.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of or replacement of particular Plan investments or removal or replacement of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

100.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

101.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

102.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

103.    As described throughout this Complaint, Defendants breached their fiduciary duties with respect to the Plan by, *inter alia*:

a.  Failing to adopt a process for administering the Plan and managing the Plan's investment lineup that was consistent with the applicable standard of care and in the best interest of Plan participants;

b.  Failing to appropriately monitor and control the expenses paid by the Plan, including but not limited to expenses for investment advice and/or investment management, and failing to ensure the Plan's service providers were not receiving compensation that exceeded the reasonable value of their services;

c.  Failing to appropriately monitor and evaluate the Plan's index fund fees, and improperly retaining the Plan's index fund expense ratios despite the availability of lower fees, which would have been revealed by a prudent and diligent investigation or negotiation;

d.  Failing to appropriately manage and monitor the Plan's LifeStage funds, and improperly retaining those funds in the Plan despite superior alternatives in the marketplace that would have been revealed by a prudent and diligent investigation;

e.  Failing to consider alternatives to the Plan's money market fund that other fiduciaries readily considered and adopted, such as a stable fund that would have offered superior performance while still guaranteeing preservation of principal;

f.  Failing to avoid conflicts of interest, and directing millions of dollars of payments from the Plan to H-E-B without proper justification; and

g.  Failing to investigate more favorable securities lending agreements for the Plan that would have been revealed by a prudent and diligent investigation.

104.  Based on the actions and omissions described in paragraph 103 above and elsewhere in this Complaint, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

105.  Based on the actions and omissions described in paragraph 103 above and elsewhere in this Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

106.   As a consequence of Defendants' breaches of their fiduciary duties, the Plan has suffered millions of dollars in losses.

107.   Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to make good to the Plan all losses suffered as a result of Defendants' fiduciary breaches, and to disgorge all payments to H-E-B resulting from Defendants' unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief to redress Defendants' fiduciary breaches.

108.   Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Prohibited Transactions with Party in Interest
### 29 U.S.C. § 1106(a)(1)

109.   As a Plan employer, the Plan sponsor, and fiduciary of the plan, H-E-B is a party in interest under 29 U.S.C. §§ 1002(14).

110.   As described in this Complaint, Defendants have caused the Plan to engage in transactions with H-E-B for the benefit of H-E-B. These transactions took place on a periodic basis throughout the statutory period as Defendants directed fees from the Plan to H-E-B.

111.     These transactions constituted a direct or indirect transfer of assets of the Plan to a party in interest, a transfer of assets of the Plan for use by a party in interest, and a transfer of the assets of the Plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

112.     In addition, these transactions also involved the furnishing of services between the Plan and a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C).

113.     These transactions were unlawful under ERISA, and the amounts paid to H-E-B were excessive and unreasonable. As a direct and proximate result of these prohibited transactions, Plan participants directly or indirectly paid millions of dollars in improper fees to H-E-B.

114.     Defendants are liable to make good to the Plan all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief on account of these prohibited transactions.

### COUNT III
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)(1)**

115.     As alleged throughout the Complaint, H-E-B is a fiduciary of the Plan.

116.     Acting in a fiduciary capacity, Defendants improperly directed assets of the Plan to H-E-B for its own benefit. These transactions occurred on a periodic basis throughout the class period as Defendants directed fees from the Plan to H-E-B and placed them in H-E-B's account(s).

117.     These transactions were prohibited under ERISA, and the amounts paid to H-E-B were excessive and unreasonable.  H-E-B dealt with the Plan's assets in its own interest and for its own accounts, in violation of 29 U.S.C. § 1106(b)(1), and received consideration for its personal accounts in connection with transactions involving assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

118.    As a result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in improper fees to H-E-B. Defendants are liable to make good to the Plan all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief on account of these prohibited transactions.

### COUNT IV
### Failure to Monitor Fiduciaries

119.    As alleged throughout the Complaint, Defendants are fiduciaries of the Plan.

120.    H-E-B is responsible for appointing and removing the members of the Committee.

121.    Given that H-E-B had overall oversight responsibility for the Plan and the responsibility to appoint and remove members of the Committee, H-E-B had a fiduciary responsibility to monitor the performance of the Committee and its members, to ensure they were performing their duties lawfully and appropriately, in a manner that was consistent with ERISA.

122.    A monitoring fiduciary must take prompt and effective action to protect the Plan and its participants when its appointees are not meeting their fiduciary obligations under ERISA or otherwise failing to carry out their duties lawfully and appropriately.

123.    H-E-B breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of the Committee and its members, or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of the imprudent and disloyal actions and omissions of the Committee;

    b.  Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties and prohibited transactions described herein;

      c.   Failing to implement a system to avoid conflicts of interest that tainted the decisions made by the Committee; and

      d.   Failing to remove fiduciaries whose performance was inadequate for the reasons described above, to the detriment of the Plan and Plan participants' retirement savings.

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan has suffered millions of dollars in losses.

125.    Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), H-E-B is liable to restore to the Plan all losses suffered as a result of H-E-B's failure to properly monitor the Committee and its members, and must disgorge all profits resulting from its failure to monitor. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Meza and Montgomery, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.    A declaration that Defendants caused the Plan to engage in prohibited transactions;

E.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and other ERISA violations described above;

F.    An order compelling H-E-B to disgorge all monies and/or profits received from the Plan;

G.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal or replacement of imprudent funds as investment options; transfer of Plan assets in imprudent investments to prudent alternative investments; and removal or replacement of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest, and an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.      Such other and further relief as the Court deems equitable and just.

Dated: September 3, 2019

**KENDALL LAW GROUP, PLLC**
*/s/ Joe Kendall*
Joe Kendall, TX Bar No. 11260700
3811 Turtle Creek, Suite 1450
Dallas, TX  75219
Telephone: 214-744-3000
Facsimile: 214-744-3015
jkendall@kendalllawgroup.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
Kai H. Richter, MN Bar No. 0296545**
Brock J. Specht, MN Bar No. 0388343**
Carl F. Engstrom, MN Bar No. 0396298**
Brandon T. McDonough, MN Bar No. 0393259**
        * admitted in W.D. Texas
        **pro hac vice application forthcoming
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
cengstrom@nka.com
bmcdonough@nka.com

Counsel for Plaintiffs and the proposed Class
